**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| JUSTIN T. PARKER,<br>Plaintiff, | §<br>§<br>§ | |
| v. | § | Civil Action No. ______________ |
| | §<br>§ | |
| DEPUTY KEVIN TIPPIT;<br>DEPUTY BLAYNE GRIFFIN;<br>SERGEANT JAMES F. KENNEDY, JR.;<br>DEPUTY ROBERT PRUETT III;<br>DEPUTY TYLER VINCENT; and<br>BRAZORIA COUNTY, TEXAS.<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§ | JURY TRIAL DEMANDED |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff Justin T. Parker, complaining of the Defendants, alleges and says:

**PRELIMINARY STATEMENT**

1. This is a civil-rights action under 42 U.S.C. § 1983. In the early morning of December 13, 2025, Plaintiff Justin Parker — a 118-pound, shirtless man who had just been beaten by a group of bar patrons — was stopped by Brazoria County Sheriff's deputies on a rural county road. He complied with every command. With his hands in the air and no command pending, Deputy Kevin Tippit approached him from behind and kicked his legs out from under him with enough force to fracture his ankle, then knelt on his back and pressed his face into the asphalt after he was handcuffed. Deputies then ignored his repeated statements that his ankle was broken, made him stand and walk on it for field-sobriety tests, and released him roughly two hours later without a ticket, citation, or arrest. The Sheriff's Office closed the call as "UNFOUNDED," prepared a two-sentence

report that says nothing about the force, and completed none of the use-of-force documentation, medical follow-up, or supervisory review its own written policy requires.

**PARTIES**

2. Plaintiff Justin T. Parker is an individual residing in Brazoria County, Texas.

3. Defendant Kevin Tippit (BCSO No. SO2173) is an individual who, at all times relevant to this Complaint, was a deputy employed by the Brazoria County Sheriff's Office ("BCSO") and was acting under color of state law. Defendant Tippit is sued in his individual capacity.

4. Defendant Blayne Griffin (BCSO No. SO2284) is an individual who, at all times relevant to this Complaint, was a deputy employed by the Brazoria County Sheriff's Office and was acting under color of state law. Defendant Griffin is the reporting officer on BCSO Incident Report No. 2512-0265. Defendant Griffin is sued in his individual capacity.

5. Defendant James F. Kennedy, Jr. (BCSO No. SO1536) is an individual who, at all times relevant to this Complaint, was a sergeant employed by the Brazoria County Sheriff's Office and was acting under color of state law. Defendant Kennedy is the supervisor of record on BCSO Incident Report No. 2512-0265 and was the on-scene supervisor responsible under BCSO policy for responding to, documenting, and reviewing the use of force described below. Defendant Kennedy is sued in his individual capacity.

6. Defendant Robert Pruett III (BCSO No. SO2291) is an individual who, at all times relevant to this Complaint, was a deputy employed by the Brazoria County Sheriff's Office and was acting under color of state law. Defendant Pruett is sued in his individual capacity.

7. Defendant Tyler Vincent (BCSO No. SO2260) is an individual who, at all times relevant to this Complaint, was a deputy employed by the Brazoria County Sheriff's Office and was acting under color of state law. Defendant Vincent is sued in his individual capacity.

8. At all relevant times, Defendants Tippit, Griffin, Kennedy, Pruett, and Vincent (the "Individual Defendants") were acting under color of state law in their capacities as law enforcement officers, and their actions were taken intentionally, maliciously, knowingly, wantonly, recklessly, and with deliberate indifference to Plaintiff's clearly established constitutional rights, and within the scope of their employment with Brazoria County.

9. Defendant Brazoria County, Texas (the "County") is a political subdivision of the State of Texas and is the governmental entity responsible for the policies, practices, customs, and supervision of the Brazoria County Sheriff's Office and its deputies. The County may be served through the Brazoria County Judge.

10. The Sheriff of Brazoria County, Bo Stallman, is the County's final policymaker with respect to law-enforcement policy, training, supervision, and discipline within the Sheriff's Office. The Sheriff is not sued individually; his acts and omissions as final policymaker are attributable to the County.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343, as this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution of the United States.

12. Venue is proper in the United States District Court for the Southern District of Texas, Galveston Division, pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claims occurred in Brazoria County, Texas, which is within this Division and judicial district, and all Individual Defendants reside in Texas.

## FACTUAL ALLEGATIONS

### ***A. The assault at the bar and the "deadly conduct" call***

13. On December 13, 2025, at approximately 2:00 a.m., Plaintiff Justin T. Parker and a friend were at the Half Time 36 Bar located at 23220 SH 36, Damon, Texas.

14. As Plaintiff and his friend exited the bar to walk toward Plaintiff's white Ford truck truck, a group of four to five young women began assaulting Plaintiff for no reason known to Plaintiff.

15. During the assault by the young women, Plaintiff's shirt was ripped off of his body and was later found in the bar parking lot the following day.

16. As Plaintiff's friend was exiting the bar, several young men also exited and began assaulting both Plaintiff and his friend.

17. While being assaulted by the other bar patrons, Plaintiff did not fight back against the young women or men but instead went into a fetal position on the ground to protect his head and face.

18. Plaintiff's only thought during the assault was to get to his truck and leave the premises.

19. At no time that night did Plaintiff fire, display, brandish, or threaten anyone with a firearm.

20. Plaintiff and his friend were able to reach Plaintiff's truck and exit the bar parking lot, turning right onto SH 36 and then left onto the county road.

21. Unbeknownst to Plaintiff, at approximately 2:31 a.m. one or more bar patrons reported to BCSO that Plaintiff had engaged in "deadly conduct" involving a firearm. BCSO opened Incident No. 2512-0265, coded the offense as Deadly Conduct under Texas Penal Code § 22.05(a), listed three bar patrons as "victims," listed Plaintiff as the sole suspect, and listed Plaintiff's truck as the vehicle "used in incident."

22. BCSO never developed any evidence that Plaintiff fired or displayed a weapon. BCSO ultimately closed Incident No. 2512-0265 with the disposition "UNFOUNDED." Plaintiff was never arrested, cited, or charged with any offense arising from that night.

***B. The stop***

23. Just prior to the turn onto County Road [15/18], Plaintiff observed a vehicle behind him with yellow overhead-type lights activated and was concerned it may have been someone from the bar who had followed him.

24. Within seconds, the vehicle activated red and blue lights, revealing it to be a law enforcement vehicle.

25. Plaintiff immediately pulled his truck over to the side of the road in Damon, Texas, with the right tire positioned in the ditch.

26. Plaintiff was not wearing a shirt and was wearing only pants and steel-toed boots. Plaintiff is approximately 5'9" tall and, according to BCSO's own incident report, weighed approximately 118 pounds. Because Plaintiff was shirtless, any deputy looking at him could see that he had no weapon on his torso, waistband, or arms.

27. Once Plaintiff's vehicle was stopped, Defendant Tippit exited his patrol vehicle and began yelling commands without using his public-address system.

28. Defendant Tippit then used his public-address system to order Plaintiff to put his hands outside the vehicle, exit the truck, and step away from the truck with his hands up.

29. Plaintiff complied with all of Defendant Tippit's commands, promptly and without argument.

30. Defendant Tippit directed Plaintiff to walk into and stand in the lane of oncoming traffic, and Plaintiff did so.

31. While Plaintiff was standing in the roadway with his hands up in full compliance, Defendant Tippit aggressively approached him from behind.

32. Defendant Tippit gave no verbal commands to Plaintiff as he approached—he did not tell Plaintiff to spread his feet, to kneel, to get on the ground, or to do anything else—and gave Plaintiff no opportunity to comply with whatever Tippit intended for him to do.

### *C. The use of force*

33. Without warning, Defendant Tippit kicked Plaintiff's legs with sufficient force to fracture Plaintiff's left ankle, knocking Plaintiff to the ground.

34. Plaintiff immediately felt his ankle break and cried out that Tippit had broken his ankle.

35. Defendant Tippit then handcuffed Plaintiff while Plaintiff lay on the pavement.

36. After Plaintiff was handcuffed, Defendant Tippit drove his knee into Plaintiff's back between his shoulder blades and, with his weight on his knee, pushed Plaintiff's face into the asphalt pavement.

37. Defendant Tippit maintained this position for approximately 2 or more minutes even though Plaintiff was handcuffed, prone, unarmed, shirtless, not resisting, not attempting to flee, and had been compliant from the beginning of the stop.

38. While Plaintiff was still on the ground with Defendant Tippit on top of him, another unknown deputy, walked up between Plaintiff and his truck carrying what appeared to be an AR-15-style rifle, and stood within a few feet of Plaintiff and Tippit.

39. Plaintiff anxiously made the deputies aware that there was a passenger in the vehicle and told his friend to show his hands, in fear that one of the deputies might fire on his friend.

40. Defendants Vincent, Pruett, Griffin, and Kennedy were present at the roadside during the period in which Tippit knelt on Plaintiff's back and pressed his face into the asphalt. Each was within approximately 4-5 feet of Plaintiff and Tippit, had an unobstructed view of Tippit's knee on the back of a handcuffed, prone, 118-pound man, and heard Plaintiff say that his ankle was broken. The restraint lasted long enough—approximately 3 minutes—that each had a realistic opportunity to tell Tippit to remove his knee, to lift Plaintiff's face off the pavement, or to take over the restraint. None did.

41. At some point after the passenger was identified, Defendant Tippit picked Plaintiff up from the ground by the arms and handcuffs.

42. Defendant Tippit repeatedly asked Plaintiff about his wallet. Plaintiff did not have a wallet; he had his driver's license and some cash in his front left pocket, and he told Tippit so. Defendant Tippit patted Plaintiff's pants pockets and then placed Plaintiff, still handcuffed and still complaining that his ankle was broken, in the back seat of a patrol vehicle and closed the door.

43. While Plaintiff sat handcuffed in the patrol vehicle, deputies searched Plaintiff's truck and located a .38-caliber revolver in the center console. Plaintiff lawfully possessed the revolver. It had not been fired that night. The deputies did not seize the revolver and did not charge Plaintiff with any weapons offense.

44. Eventually Defendant Tippit returned to the patrol vehicle, ordered Plaintiff out, removed the handcuffs, and—for the first time—told Plaintiff that he was being accused of firing a weapon at the bar. Plaintiff told Tippit that he had not fired a weapon and that he had been the one assaulted.

***D. Complaints of injury; no medical care; field-sobriety tests on a broken ankle***

45. Beginning immediately after the kick and continuing throughout the encounter, Plaintiff repeatedly told Defendant Tippit that Tippit had broken his ankle. Plaintiff also said so in the presence and hearing of Defendants Vincent, Pruett, Griffin, and Kennedy.

46. Plaintiff's left ankle and foot visibly swelled during the encounter, and Plaintiff was unable to bear weight on it normally. Photographs taken later that day show the swollen left foot and a head injury from being put on the ground.

47. No deputy examined Plaintiff's ankle, called for EMS, offered medical attention, or asked Plaintiff whether he wanted medical attention.

48. Instead, Defendant Tippit, along with the other defendant Deputies, insisted that Plaintiff perform field-sobriety tests that required Plaintiff to stand, balance, and walk on his fractured ankle.

49. While in the back of the patrol car, Plaintiff told a deputy about being assaulted at the bar.

50. Plaintiff asked the deputies why he was pulled over, but was not told until the end of the encounter, and was never given any explanation for the force used against him.

51. After approximately two hours of detention, Plaintiff was released with no ticket, no arrest, and no citation.

52. As a direct result of Defendant Tippit's use of force, Plaintiff sustained a fractured left ankle.

53. Plaintiff also sustained injuries to his head and injury to his back from Defendant Tippit's knee and from having his face pressed into the asphalt.

54. Because no deputy summoned medical care and because deputies made Plaintiff stand and walk on the fractured ankle, Plaintiff's injury was aggravated and his treatment was delayed by 4 or more hours.

55. Defendant Tippit stated multiple times, in Plaintiff's presence and on Tippit's body-worn camera and in-car recordings, that his actions, including kicking Plaintiff's ankle hard enough to break it, were "protocol."

***E. The aftermath: a two-sentence report, no use-of-force report, no review***

56. BCSO Incident Report No. 2512-0265 identifies Defendant Griffin as the reporting officer, Defendant Kennedy as the supervisor, and Defendants Kennedy, Vincent, Pruett, and Tippit (along with Deputy N. Christopher) as assisting officers.

57. The report's entire narrative consists of two sentences: that on December 13, 2025, BCSO deputies were dispatched to the 23200 block of SH 36 "in reference to a suspicious circumstance," and that "information was gathered and a report taken." The report says nothing about the traffic stop of Plaintiff, the force used on him, his injury, his complaints of injury, the search of his truck, or the field-sobriety tests. It records the disposition as "UNFOUNDED."

58. No use-of-force report was completed by Defendant Tippit, by Defendant Kennedy, or by anyone else at BCSO for this incident, even though Tippit used force that fractured a compliant man's ankle and the man complained of the injury on scene.

59. Defendant Kennedy, the supervisor of record, did not ensure that Plaintiff was examined or treated, did not obtain a recorded interview of Plaintiff about the force used on him, did not photograph Plaintiff's injuries, did not complete a use-of-force report in BCSO's records-management system, did not route a notification of a potential claim, and did not initiate an administrative investigation.

60. On information and belief, no BCSO divisional lieutenant, division commander, or the Sheriff reviewed Tippit's use of force; no administrative investigation was opened; and Tippit was not disciplined, retrained, or counseled. On information and belief, Tippit remains a BCSO deputy.

61. Plaintiff made at least two attempts to contact Defendant Griffin about the incident, leaving messages for Griffin to return his call, but Defendant Griffin never responded.

62. Plaintiff's family submitted Texas Public Information Act requests on January 7, 2026 and May 27, 2026 seeking, among other things, body-worn and in-car camera footage, use-of-force reports, CAD logs, and supplemental narratives for Incident No. 2512-0265.

63. A Texas State Trooper was also present at the scene for part of the encounter but has not been identified.

***F. BCSO's written use-of-force policy and the County's practice of not enforcing it***

64. BCSO maintains a written Use of Force policy, Policy 300 of its Law Enforcement Policy Manual (a Lexipol policy). Under Policy 300.3, deputies may use only the force that reasonably appears necessary, and Policy 300.3.4 directs deputies to consider, among other things, the immediacy of any threat, the subject's conduct as perceived, deputy/subject factors such as relative size, the degree to which the subject has already been restrained, and the availability of other options.

65. Policy 300.2.1 imposes a duty on every deputy, regardless of rank, who is present and observes another officer using force clearly beyond what is objectively reasonable to intervene to prevent it when in a position to do so, and to report the force to a supervisor.

66. Policy 300.5 requires that any use of force be documented "promptly, completely, and accurately" in an appropriate report. Policy 300.5.1 requires supervisory notification as soon as practicable after any force above verbal commands, and requires supervisors to notify the Division Commander whenever the force caused a visible injury or the subject complained of injury or continuing pain.

67. Policy 300.7 provides that when a supervisor responds to an incident involving a reported application of force, the supervisor is expected to ensure that injured parties are examined and treated; separately obtain a recorded interview with the person on whom force was used; ensure photographs are taken of any visible injury or area of complained pain; complete a use-of-force report in the RMS "Use of Force" module; route a notification of a potential claim if there is any indication of civil litigation; and initiate an administrative investigation if there is any question of policy non-compliance. Policy 300.7 further provides that all use-of-force reports shall be reviewed by a Divisional Lieutenant and the Division Commander, and Policy 300.7.1 requires the Shift Supervisor to review each use of force within his command.

68. Every one of those requirements was triggered on December 13, 2025. Tippit used force well above verbal commands; the force caused a fracture; Plaintiff complained of the injury on scene; and Defendant Kennedy, a sergeant, was the supervisor of record. None of the requirements was met.

69. Tippit's repeated on-camera statements that kicking a compliant, hands-up subject's legs out from under him was "protocol," combined with the absence of any use-of-force report, supervisory review, or discipline, plausibly show that BCSO's actual practice—as distinct from its written policy—is (a) to train or permit deputies to apply forceful leg strikes and prone knee restraints to compliant subjects during high-risk stops, and (b) not to report, review, investigate, or discipline uses of force that injure compliant subjects.

**COUNT I — EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT**
*(42 U.S.C. § 1983 against Defendant Kevin Tippit)*

71. Plaintiff realleges and incorporates by reference paragraphs 1 through 70.

72. At all times relevant to this Complaint, Defendant Tippit was acting under color of state law in his capacity as a Brazoria County Sheriff's Office deputy.

73. The Fourth Amendment, applicable to the States through the Fourteenth Amendment, prohibits unreasonable seizures, including the use of excessive force in the course of a stop or arrest.

74. Defendant Tippit seized Plaintiff within the meaning of the Fourth Amendment when he stopped Plaintiff's vehicle, ordered Plaintiff out of the vehicle, and detained Plaintiff.

75. Defendant Tippit used excessive force against Plaintiff in violation of the Fourth Amendment by kicking Plaintiff's legs with sufficient force to fracture Plaintiff's ankle while Plaintiff was standing with his hands raised, compliant, unarmed, and under no command that he had failed to obey.

76. Defendant Tippit used excessive force against Plaintiff in violation of the Fourth Amendment by kneeling with his weight on Plaintiff's back and pressing Plaintiff's face into the asphalt pavement for a sustained period while Plaintiff was handcuffed, prone, compliant, and posed no threat.

77. At the time Defendant Tippit used force against Plaintiff, Plaintiff was compliant, did not resist or attempt to flee, and posed no immediate threat to the safety of the officers or others. Plaintiff was shirtless, so that the absence of any weapon on his person was apparent; weighed approximately 118 pounds; was outnumbered by armed deputies; and, once handcuffed, had no capacity to resist at all.

78. That deputies had received a report accusing Plaintiff of deadly conduct did not justify the force. A high-risk stop permits commands, cover, and controlled restraint of a compliant subject; it does not permit a deputy to fracture the ankle of a man who has obeyed every command, or to kneel on his back and grind his face into the road after he is handcuffed. Tippit had ample, obvious, and less injurious alternatives — including simply telling Plaintiff to kneel or lie down — and chose none of them.

79. The amount of force used by Defendant Tippit was objectively unreasonable under the circumstances and was clearly excessive to the need.

80. It was clearly established long before December 13, 2025 that an officer violates the Fourth Amendment by using significant force—including takedowns, strikes, and sustained prone restraint—against a subject who is compliant, not resisting, and not fleeing, and by continuing to apply force after a subject is restrained and subdued. *See, e.g., Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017); *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018); *Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017); *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012); *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008); *Timpa v. Dillon*, 20 F.4th 1020 (5th Cir. 2021). No reasonable officer could have believed Tippit's conduct was lawful.

81. Defendant Tippit's use of excessive force was malicious, wanton, and in reckless disregard of Plaintiff's constitutional rights, warranting punitive damages.

82. As a direct and proximate result of Defendant Tippit's use of excessive force, Plaintiff suffered severe physical injuries including a fractured ankle, head injuries, and back injuries; physical pain, mental anguish, emotional distress, and humiliation; past and future medical expenses; and lost wages and earning capacity.

**COUNT II — BYSTANDER LIABILITY FOR EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT**

*(42 U.S.C. § 1983 against Defendants Vincent, Pruett, Griffin, and Kennedy)*

83. Plaintiff realleges and incorporates by reference paragraphs 1 through 70.

84. At all times relevant to this Complaint, Defendants Vincent, Pruett, Griffin, and Kennedy were acting under color of state law in their capacities as Brazoria County Sheriff's Office deputies.

85. An officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under § 1983 where he (1) knows that a fellow officer is violating an individual's constitutional rights, (2) has a reasonable opportunity to prevent the harm, and (3) chooses not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013); *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

86. Defendant Vincent was present at the roadside and was positioned away from Plaintiff and Tippit, with an unobstructed view, during the approximately 2 to 3 minutes in which Tippit knelt on the back of Plaintiff—who was handcuffed, prone, shirtless, not resisting, and stating that his ankle was broken—and pressed Plaintiff's face into the asphalt. Vincent knew that force was being applied to a restrained, compliant man for no

legitimate purpose, had a reasonable opportunity to tell Tippit to get off Plaintiff or to intervene physically, and chose not to.

87. Defendant Pruett was present at the roadside from and was positioned away from Plaintiff and Tippit, with an unobstructed view, during the same period. Pruett knew that force was being applied to a restrained, compliant man for no legitimate purpose, had a reasonable opportunity to intervene, and chose not to.

88. Defendant Griffin was present at the roadside and was positioned away from Plaintiff and Tippit, with an unobstructed view, during the same period. Griffin knew that force was being applied to a restrained, compliant man for no legitimate purpose, had a reasonable opportunity to intervene, and chose not to.

89. Defendant Kennedy, a sergeant and the supervisor on scene, was present at the roadside and was positioned away from Plaintiff and Tippit, with an unobstructed view, during the same period. As Tippit's supervisor, Kennedy had not only the opportunity but the authority to order Tippit to release Plaintiff, and chose not to.

90. Each of these Defendants was also bound by BCSO Policy 300.2.1, which required him to intervene to prevent clearly unreasonable force when in a position to do so and to report it to a supervisor. None intervened and none reported.

91. It was clearly established before December 13, 2025 that an officer who is present and has a reasonable opportunity to prevent a fellow officer's use of excessive force on a restrained, compliant subject, and who chooses not to act, violates the Fourth Amendment.

92. As a direct and proximate result of Defendants Vincent's, Pruett's, Griffin's, and Kennedy's failure to intervene, Plaintiff suffered prolonged pain, head and back injury,

and the aggravation of his ankle injury from the sustained prone restraint; physical pain, mental anguish, emotional distress, and humiliation; and medical expenses.

**COUNT III — DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS IN VIOLATION OF THE FOURTEENTH AMENDMENT**

*(42 U.S.C. § 1983 against Defendants Tippit and Kennedy)*

93. Plaintiff realleges and incorporates by reference paragraphs 1 through 70.

94. The Fourteenth Amendment prohibits state actors from displaying deliberate indifference to the serious medical needs of persons they have seized and hold in custody, including arrestees and detainees who have not yet been booked.

95. After Defendant Tippit used excessive force against Plaintiff, Plaintiff was handcuffed, placed in the locked rear compartment of a patrol vehicle, and held in the custody of Defendants for approximately two hours. He was not free to leave and could not seek medical care on his own.

96. Plaintiff repeatedly told Defendant Tippit that Defendant Tippit had broken his ankle, beginning the moment it happened. Tippit heard him and responded by stating that the kick was “protocol.” Plaintiff’s statements were also made in the presence and hearing of Defendant Kennedy.

97. Plaintiff’s fractured ankle constituted a serious medical need: a fracture caused by a blow hard enough to knock a man off his feet, accompanied by immediate and repeated complaints of a broken bone, visible swelling, and inability to bear weight normally, was obvious to any layperson, and Tippit—who delivered the kick and heard the complaint—actually knew of it.

98. Despite Plaintiff's repeated complaints of a broken ankle and the visible injury, Defendants Tippit and Kennedy failed to provide Plaintiff with any medical care, summon medical assistance, or even ask Plaintiff whether he wanted medical assistance.

99. Instead of providing medical care, Defendant Tippit and deputies acting with him insisted that Plaintiff perform field-sobriety tests, which required Plaintiff to stand, balance, and walk on his fractured ankle, knowing that he had complained the ankle was broken.

100. Defendant Kennedy, as the on-scene supervisor and supervisor of record, was specifically required by BCSO Policy 300.7 to ensure that any injured party was examined and treated and to obtain a recorded interview of the person on whom force was used. Kennedy knew force had been used and knew Plaintiff was complaining of a broken ankle, and he made the deliberate choice to do neither. Kennedy's failure was not negligence or inadvertence; it was a conscious decision to disregard a known, serious injury inflicted by his subordinate.

101. Defendants Tippit's and Kennedy's failure to provide medical care in the face of Plaintiff's obvious serious medical need constituted deliberate indifference to Plaintiff's constitutional rights.

102. As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's serious medical needs, Plaintiff endured approximately two hours of untreated pain from a fractured ankle; was forced to bear weight on the fracture during field-sobriety testing; and suffered aggravation of the injury and delayed treatment.

## COUNT IV — MUNICIPAL LIABILITY UNDER *MONELL*
*(42 U.S.C. § 1983 against Defendant Brazoria County)*

103. Plaintiff realleges and incorporates by reference paragraphs 1 through 70.

104. Defendant Brazoria County is a political subdivision of the State of Texas and is responsible for the policies, practices, customs, and actions of the Brazoria County Sheriff's Office. The Sheriff of Brazoria County is the County's final policymaker for law-enforcement matters, including the use of force, the reporting and review of force, and the training, supervision, and discipline of deputies.

105. A municipality is liable under § 1983 where (1) an official policy or custom, (2) promulgated or known to a final policymaker, (3) was the moving force behind a constitutional violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). A "custom" may be shown by a persistent, widespread practice so common and well-settled as to represent official policy, or by a final policymaker's ratification of unconstitutional conduct with knowledge of its basis. *Peterson v. City of Fort Worth*, 588 F.3d 838, 847–52 (5th Cir. 2009).

***Theory 1 — Custom of applying injurious force to compliant subjects during stops, held out as "protocol"***

106. Defendant Tippit, an experienced BCSO deputy, stated repeatedly and on camera that kicking the legs out from under a compliant, hands-up subject hard enough to fracture his ankle was "protocol." A deputy does not describe his own conduct as "protocol," to a subject he has just injured and on his own body-worn camera, unless he has been trained or permitted to believe that BCSO approves of it.

107. On information and belief, BCSO trains deputies, or knowingly permits deputies, to perform forceful leg strikes and prone knee restraints on compliant subjects during high-risk stops without regard to whether the subject is resisting, is restrained, or has been given a command to comply with.

***Theory 2 — Custom of not reporting, reviewing, investigating, or disciplining injurious uses of force***

108. BCSO's written Policy 300 requires every use of force above verbal commands to be reported, requires supervisory response and documentation when a subject complains of injury, requires medical evaluation and photographs, and requires lieutenant- and commander-level review. On December 13, 2025, every one of those requirements was triggered and none was followed: no use-of-force report, no medical evaluation, no photographs, no recorded interview, no potential-claim notice, no administrative investigation, no review, and no discipline. The incident was instead closed with a two-sentence narrative that omits the force entirely and a disposition of "UNFOUNDED."

109. The complete and simultaneous failure of a sergeant, the reporting deputy, and the reviewing chain of command to perform any of the mandatory steps Policy 300 prescribes is not plausibly the product of individual oversight. It reflects BCSO's actual, well-settled practice of treating injurious force against compliant subjects as unremarkable and not subject to reporting or review.

110. A custom of not reporting and not reviewing force communicates to deputies that injurious force against compliant subjects carries no consequence, and is a moving force behind uses of force like Tippit's.

***Theory 3 — Ratification***

111. On information and belief, the Sheriff and his designated command staff were made aware of the incident—through the incident report naming Plaintiff as a suspect in a firearm offense and listing his truck as evidence, through the supervisor's knowledge of the force and injury, through Plaintiff's calls to Deputy Griffin, and through the Public

Information Act requests submitted by Plaintiff's family in January and May 2026 expressly describing a "use of force incident" and requesting use-of-force reports—and, with that knowledge, approved the closing of the incident as "UNFOUNDED" with no use-of-force report, no investigation, and no discipline. That approval, with knowledge of the basis for Tippit's conduct, constitutes ratification of Tippit's use of force and of the failure to provide medical care.

112. Defendant Brazoria County's customs and practices described above were maintained with deliberate indifference to the known and obvious risk that deputies would use excessive force against compliant persons and would deny them medical care, and that such constitutional violations would go unreported, unreviewed, and undeterred.

113. The customs and practices of Defendant Brazoria County described above were the moving force behind the constitutional violations suffered by Plaintiff: Tippit used the force he described as "protocol" because BCSO trained or permitted him to, and no deputy intervened, reported, or sought medical care because BCSO's practice was that none of those things would be required or reviewed.

114. As a direct and proximate result of Defendant Brazoria County's customs and practices, Plaintiff suffered severe physical injuries including a fractured ankle, head injuries, and back injuries; physical pain, mental anguish, emotional distress, and humiliation; past and future medical expenses; and lost wages and earning capacity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Justin T. Parker respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally where permitted by law, and award the following relief:

a. Compensatory damages in an amount to be determined at trial, including damages for past and future physical pain, mental anguish, physical impairment, disfigurement, medical expenses, and lost wages and earning capacity;

b. Punitive damages against each Individual Defendant in amounts to be determined at trial that are sufficient to punish and deter similar conduct in the future;

c. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

d. Pre-judgment and post-judgment interest as provided by law; and

e. Any other relief the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

//

//

//

//

//

//

//

//

//

//

//

Respectfully Submitted:

*/s/ Solomon M. Radner*
SOLOMON M. RADNER
Radner Law Group, PLLC
Attorney-in-Charge
17515 W. 9 Mile Rd. Ste. 1050
Southfield, MI 48075
Tel: (877) 723-6375
Fax: (866) 571-1020
solomon@radnerlawgroup.com

- & -

*/s/ Brandon J. Grable*
BRANDON J. GRABLE
Grable PLLC
Local Counsel
Texas State Bar No. 24086983
SDTX Bar No. 3246103
brandon@grable.law
12451 Starcrest Dr., Ste. 206
San Antonio, Texas 78216
Telephone: (210) 963-5297
Facsimile: (726) 215-4765

**Counsel for Plaintiff**